[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 14, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-12795

_____

D. C. Docket No. 99-03215-CV-PAS

ANGEL NIEVES DIAZ,

Petitioner-Appellant,

versus

SECRETARY FOR THE
DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 14, 2005)

Before EDMONDSON, Chief Judge, MARCUS and PRYOR, Circuit Judges.

PRYOR, Circuit Judge:

The key issue in this habeas corpus appeal is whether counsel for Angel Nieves Diaz, a Florida prisoner sentenced to death, was ineffective for not arguing, in his direct appeal, that Diaz was absent from several pretrial hearings and other discussions among the trial court and counsel. Because the minor proceedings from which Diaz was absent were outside the presence of the jury, no objection was made, and Diaz was not prejudiced by his absences, we conclude that the district court correctly found that this argument had no chance of success in Diaz's direct appeal. We also conclude that Diaz's other arguments are meritless. We, therefore, affirm the denial of Diaz's habeas petition.

## I. BACKGROUND

Angel Nieves Diaz was one of three men who robbed the Velvet Swing Lounge in Miami, Florida, in late December 1979. Diaz v. State, 513 So. 2d 1045, 1046-47 (Fla. 1987) (Diaz I). Diaz and his cohorts murdered Joseph Nagy, the bar manager, in the course of their robbery. Id. No one witnessed Nagy's murder because "[t]he majority of the patrons and employees had been forcibly confined to a restroom" and those that had not been moved into the restroom hid underneath the bar, for fear that they too would be killed. Id. Diaz and his co-defendant, Angel "Sammy" Toro, were tried in a Miami court almost six years to the day after they committed their crimes.

2

Diaz was represented by counsel until the moment before opening arguments began. Diaz then decided to conduct his own defense, against the advice of both his lawyer and the trial judge. The trial judge was "amazed," however, by Diaz's ability to represent himself and specifically praised Diaz's ninety-minute cross-examination of a witness for the State. Diaz was nevertheless "convicted of first-degree murder, four counts of kidnapping, two counts of armed robbery, one count of attempted robbery, and one count of possessing a firearm during the commission of a felony." Id. "The trial court sentenced Diaz to a total of 834 years of imprisonment and imposed the jury's recommended sentence of death" for the murder of Joseph Nagy. Id. Diaz's co-defendant in the crime, "Sammy" Toro, was sentenced to life imprisonment, despite some evidence that Toro, not Diaz, was the shooter. Id. at 1049. A jailhouse informant testified at Diaz's trial, however, that Diaz admitted that he shot Joseph Nagy. Id. at 1048.

Diaz's death sentence was "based on five aggravating circumstances and no mitigating circumstances," but the Florida Supreme Court struck one of the aggravating circumstances on direct appeal. See Diaz v. Dugger, 719 So. 2d 865, 866 & n.1 (Fla. 1998) (Diaz II). The four remaining aggravating circumstances were "Diaz was under sentence of imprisonment, had previously been convicted of another capital felony, ... committed the murder during a kidnapping, and

3

committed the murder for pecuniary gain." Id. at 866 n.1. In the direct appeal,

then-Justice Barkett concurred with a compelling summary of why Diaz's death

sentence was proper:

> ... I cannot fault the result based on the record in this case, which could have convinced a judge and jury beyond a reasonable doubt that Diaz was the more culpable of the two perpetrators. Moreover, the defendant's prior record in this instance includes an armed robbery, two escapes, the assault and battering of correctional officers, and a conviction for murdering the director of a drug rehabilitation center by stabbing him nineteen times while he slept. On this record, there is sufficient evidence and sufficient aggravating factors to support the conviction and sentence.

Id. at 1049-50 (Barkett, J., specially concurring). Diaz exhausted his direct appeal

when the Supreme Court of the United States denied his petition for a writ of

certiorari. Diaz v. Florida, 484 U.S. 1079, 108 S. Ct. 1061 (1988). Diaz then

began to attack his sentence collaterally.

Diaz next filed a motion in the sentencing court, under Florida Rule of

Criminal Procedure 3.850, to overturn his death sentence. The trial court held an

evidentiary hearing on one of the claims Diaz presented: ineffective assistance of

counsel during the penalty phase of his trial. The trial court later denied relief on

that claim. Diaz appealed that denial to the Florida Supreme Court, which also

denied relief. Diaz II, 719 So. 2d at 865. The Florida court also denied Diaz's

separate petition for a writ of habeas corpus. Id. The Supreme Court denied his

4

petition for certiorari. <u>Diaz v. Dugger</u>, 526 U.S. 1100, 119 S. Ct. 1580 (1999). Diaz filed a successive habeas petition in the Florida Supreme Court, but that petition was denied as well.

Between his first state collateral attack and his successive state habeas petition, Diaz filed a petition for a writ of habeas corpus in the Southern District of Florida under 28 U.S.C. section 2254. Diaz amended that petition after his successive habeas petition was denied by the Florida Supreme Court. The district court denied Diaz's habeas petition. Diaz sought and was granted a certificate of appealability from the district court on all of the issues presented in his habeas petition. This appeal followed.

## II. STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this appeal and limits our review of the decisions of the state courts:

> A federal court may not grant a petition for a writ of habeas corpus to a state prisoner on any claim that has been adjudicated on the merits in state court unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

<u>Clark v. Crosby</u>, 335 F.3d 1303, 1307-08 (11th Cir. 2003) (citations omitted). A general framework of substantial deference governs our review of every issue that

5

the state courts have decided:

> [A] state-court decision can be "contrary to" this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.
>
> ...
>
> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Williams v. Taylor, 529 U.S. 362, 405-07, 120 S. Ct. 1495, 1519-20 (2000). We will not, therefore, grant Diaz's habeas petition unless the determination of the Florida Supreme Court was either contrary to, or an unreasonable application of, Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), which governs Diaz's claim of ineffective assistance of appellate counsel.

## III. DISCUSSION

We first address Diaz's argument of ineffective assistance of appellate counsel regarding Diaz's absence from critical stages of his trial. We then discuss

6

Diaz's other ineffective assistance of counsel arguments. Finally, we address the four other issues Diaz has raised.

*A. Diaz's Ineffective Assistance of Appellate Counsel Claim Regarding Diaz's Absence from Critical Stages of His Trial*

The Supreme Court has held that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." Kentucky v. Stincer, 482 U.S. 730, 745, 107 S. Ct. 2658, 2667 (1987). Diaz has identified eleven allegedly critical trial court proceedings from which he was either absent or during which he alleges that there was no interpreter. Diaz contends that each of these absences, both individually and cumulatively, should have been raised by his appellate counsel and that the failure of counsel to raise them constitutes prejudicial ineffective assistance of counsel under Strickland. For ease of discussion, we consider the pretrial absences first because Diaz was still represented by counsel at that time. We then review the absences that Diaz identified as occurring when he served as his own lawyer with the aid of standby counsel.

1. Pretrial Absences

Diaz was represented by Peter Ferrero before his trial, and Ferrero was followed by Robert Lamons, who represented Diaz during some pretrial matters

7

and even served as standby counsel after Diaz decided to represent himself. Although Diaz was represented by counsel at every pretrial proceeding he has identified, his exclusion from those proceedings could have violated Stincer if Diaz's presence would have contributed to the fairness of the pretrial proceedings, but, under Strickland, Diaz must prove more. To win relief in this habeas appeal, Diaz's appellate counsel not only must have been ineffective, Diaz must have suffered prejudice to the level required by Strickland. Under that standard, Diaz's arguments fail.

Diaz complains about several absences that occurred while he was represented by counsel, but each time his trial counsel failed to object. When the trial court appointed the expert requested by the defense, there was no objection lodged regarding Diaz's absence. When the trial court held a hearing at which the defense requested that the death penalty be ruled out, Diaz's counsel explicitly waived Diaz's right to be present. When Diaz's attorney sought the address of a witness that might testify against Diaz, Diaz's attorney did so without stating that he would prefer Diaz to be present. During a hearing regarding a witness against Toro, Diaz's counsel never objected to the fact that Diaz was not present. Contrary to Diaz's assertion, when the trial court held a hearing regarding the security measures that it would impose, Diaz's attorney did not object to Diaz's absence.

Under Florida law, an error that passed without objection cannot be raised on appeal; appellate counsel, therefore, is not ineffective for failure to raise a meritless argument. See, e.g., Card v. State, 497 So. 2d 1169, 1174, 1177 (Fla. 1986). Each of Diaz's pretrial absences came and went without objection from his attorney, and the record shows that Diaz and the court interpreter were present at some of the proceedings from which Diaz claims he was absent. Diaz also has not explained how his presence at these proceedings would have contributed to their fairness. The district court, therefore, correctly determined that Diaz's appellate counsel did not violate Strickland by not raising these issues on appeal.

2. Absences Occurring After Diaz Decided to Represent Himself

The first absences Diaz contends should have been raised by his appellate counsel are Diaz's absence from the presentation of an oral competency report and finding of the trial court that Diaz was competent. During the time that Diaz was absent, the trial court received oral reports that Diaz was "very competent." Diaz, however, neither objected to this absence, nor suffered prejudice as a result of his absence. When asked by the prosecution to make a formal finding on the record that Diaz was competent, the trial judge stated that she would not make a finding until Diaz was present, but that she was giving the prosecution and Diaz's standby counsel an initial competency report for informative purposes only. After Diaz

9

was brought into the courtroom, the trial court stated, outside the presence of the jury, that she was "amazed at the ability of Mr. Diaz to represent himself considering his statements concerning his educational background; ... Mr. Diaz very competently cross-examined several witnesses, one for more than an hour and a half, and appears very competent to handle his own defense." After his standby counsel carefully explained the ramifications of the competency reports, Diaz made a reasoned decision to stipulate to the accuracy of those reports. Diaz did not object to the fact that the trial court accepted those oral reports outside his presence, and there is no evidence that his presence would have served any purpose at that proceeding in the light of the full colloquy that later took place when he was present. His appellate counsel, therefore, was not ineffective for failure to raise this issue on direct appeal.

The second absence that Diaz contends should have been raised on appeal is his absence from a discussion regarding Hector Torres, a criminal who stated that he had information regarding the jailhouse informant that identified Diaz as the actual shooter in the murder of Joseph Nagy. The record shows that Diaz was absent from the courtroom only because he was not yet ready to return from the recess that Diaz had requested. During Diaz's absence, the trial court discussed with the prosecution and Diaz's standby counsel the appointment of new counsel

10

to represent Torres regarding his request for a plea deal with the State.  The prosecution stated that Torres likely possessed only inculpatory information and, if so, there would be no plea agreement with Torres.  The prosecution also stated that, if Torres had any exculpatory information that came to light during his request for a plea agreement, Torres would be made available for Diaz to examine all exculpatory information.  During this portion of the trial, Diaz's presence would have been useless because, at that time, the trial court did not suspect that Torres held any information that would have been beneficial to Diaz.  "[T]he benefit" of Diaz's presence would have been "but a shadow."  Snyder v. Massachusetts, 291 U.S. 97, 106-07, 54 S. Ct. 330, 332 (1934), overruled on other grounds Malloy v. Hogan, 378 U.S. 1, 6, 84 S. Ct. 1489, 1492 (1964).

When the trial court later questioned Torres's court-appointed attorney regarding the information that Torres possessed, Diaz's presence would not have provided any value.  The attorney assigned to Torres told the court that "based on [his] interview with Mr. Torres, he has nothing that would put the State under any obligation to disclose any information under ... Brady v. Maryland.  Nor does he have any information that would in any way be considered exculpatory for the defense."  The trial judge confirmed that she would not allow a plea by Torres in exchange for inculpatory information regarding the murder of Joseph Nagy.  When

11

Diaz's standby counsel raised the issue whether Torres had "information about any witness, specifically, Ralph Gajus[, the jailhouse informant who testified that Diaz was the shooter,] or others that would tend to be favorable to" Diaz, the attorney representing Torres testified that there was "absolutely no exculpatory evidence." The only individuals with whom Torres sought to converse were prosecutors, and the trial court flatly refused Torres's overtures for a plea agreement in return for information that would tie Diaz to the murder of Joseph Nagy. It is clear, therefore, that Diaz's appellate counsel was not ineffective for failure to raise the issue of Diaz's absence at the proceedings regarding Hector Torres.

The next absence that Diaz contends his appellate counsel should have pursued was Diaz's absence during a conversation between the trial court and the prosecution regarding the schedule for closing arguments. During that colloquy, the prosecution requested an hour for its closing argument and stated that Diaz should receive at least the same amount of time as the prosecution, but the court reserved its decision and later revisited this issue. When the trial court raised the issue with both the prosecution and Diaz, the prosecution then requested 45 minutes for closing and Diaz asked for only one or two minutes. Any flaw in Diaz's earlier absence was cured by that later colloquy. Diaz's appellate counsel was not ineffective for failure to raise this issue.

12

Finally, we note that the trial court asked Diaz to acknowledge specifically that he was present at all times that testimony was heard and the jury was in the courtroom:

> THE COURT: Mr. Diaz, will you concede your presence at all times when the jury was in this courtroom?
> ...
> THE DEFENDANT: What is it again?
> THE COURT: That you were present at all times when the jury was present; when any testimony or any action was taken that you were present with the jury.
> THE DEFENDANT: With the jury, yes.

Diaz's appellate counsel cannot now be faulted for failing to argue that Diaz's other minor absences, to which no objection was made, violated his constitutional rights.

## B. Diaz's Other Ineffective Assistance of Appellate Counsel Claims

Diaz contends that the district court applied the incorrect standard of review to his arguments about ineffective assistance of appellate counsel. Diaz argues that if there was a chance that an untaken appeal would have prevailed on any issue, then the district court must determine whether the failure to raise that issue on appeal was prejudicial under Strickland. Diaz is wrong.

In Lockyer v. Andrade, the Supreme Court said that "AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1)–whether a state court decision is contrary

13

to, or involved an unreasonable application of, clearly established federal law." 538 U.S. 63, 71, 123 S. Ct. 1166, 1172 (2003). The record shows that the district court carefully determined whether the appellate counsel was deficient to the level required by Strickland. The district court, therefore, did not err.

Diaz's other arguments regarding alleged ineffective assistance of appellate counsel also fail. First, Diaz argues that, under Drope v. Missouri, 420 U.S. 162, 95 S. Ct. 896 (1975), and Pate v. Robinson, 383 U.S. 375, 86 S. Ct. 836 (1966), the trial court was required to suspend proceedings until Diaz's competency was determined, even though the court did not doubt his competency. Diaz's argument fails for at least two reasons. First, there was no objection lodged at trial. Neither Diaz nor his standby counsel objected to the fact that the competency hearing was held at the end of the first day of trial. Appellate counsel would not have prevailed on this argument, and nonmeritorious claims that are not raised on appeal do not constitute ineffective assistance of counsel. See, e.g., United States v. Nyhuis, 211 F.3d 1340, 1346 (11th Cir. 2000). Second, even Drope, the case on which Diaz principally relies, embraces the idea that a competency hearing may be "defer[red] until the end of trial." 420 U.S. at 182, 95 S. Ct. at 909. The denial of this claim in state court, therefore, was not contrary to, or an unreasonable application of, Strickland.

14

Diaz next argues that his appellate counsel was ineffective because counsel did not raise an argument regarding the failure of the trial court to allow Diaz to call several witnesses in his defense. This argument fails because the trial court had a right to exclude certain witnesses as long as the exclusion of those witnesses did not compromise Diaz's ability to present his defense. Taylor v. Illinois, 484 U.S. 400, 414-15, 108 S. Ct. 646, 656 (1988). The record shows that Diaz wanted to suspend the trial to find nonessential witnesses. His appellate counsel was not ineffective for failing to raise this issue.

Diaz contends that his appellate counsel was ineffective for his failure to argue that the trial court did not independently weigh aggravating and mitigating factors, in violation of Patterson v. State, 513 So. 2d 1257 (Fla. 1987). This argument is not supported by the record. The trial court made specific oral findings of the aggravating and mitigating factors. In Patterson, by contrast, the trial court stated, without elaboration, that the aggravating factors outweighed the mitigating factors. Id. at 1262-63. Diaz's appellate counsel, therefore, was not ineffective for failing to raise this argument on direct appeal.

Diaz next contends erroneously that his appellate counsel was ineffective for his failure to argue that Diaz had an absolute right to represent himself during the penalty phase of his trial under Faretta v. California, which states that "[t]he Sixth

15

Amendment ... grants to the accused personally the right to make his defense." 422 U.S. 806, 819, 95 S. Ct. 2525, 2533 (1975). Faretta allows "the trial judge [to] terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." Id. at 834 n.46, 95 S. Ct. at 2541 n.46. Diaz sought to frustrate the completion of his trial by repeatedly changing his mind regarding self-representation at the guilt phase of the trial. Faretta allowed the trial judge to remedy Diaz's misconduct.

Diaz offered a written motion for a mistrial that alleged that the trial judge did not "remain impartial as a judge should" and "allow[ed Diaz] to incriminate [him]self by defending [his] own case without the necessary intellect to do so." The court denied Diaz's motion and found as follows that Diaz tried to frustrate the completion of his trial:

> [Mr. Diaz,] you have used your intellect to delay this trial, to attempt to stop it, and ... you have represented yourself very well; ... the Court finds that you have not limited intellect but a great deal of intellect. ... I took the precaution of having you examined by a psychiatrist and a psychologist, and their oral statements to this Court in open court were that you were very competent to stand trial, and there is nothing that you have done that changes this Court's opinion that you are very competent and very intelligent.
> ...
> I would like to state as well that the Court has allowed and has ordered the attorney that you fired, Mr. Lamons, to stay with you at all times during the trial. ... [Y]ou, obvious to everyone in this courtroom, have taken advantage of Mr. Lamons' legal ability. You have conferred with him at all times during the trial, and at every material

16

stage of the trial the Court has asked the jury to leave the courtroom so you can confer with Mr. Lamons. You have had every opportunity that could be afforded someone who desires to represent himself and even more so.

It is clear from the trial transcript that Diaz was given great leeway in the course of mounting his own defense and that Diaz abused his right to self-representation to delay his trial. The trial court properly decided that Diaz should be represented by counsel to conduct the sentencing phase. Diaz's appellate counsel was not ineffective for failing to raise this issue on appeal.

Diaz's next argument is that his appellate counsel was ineffective for failure to provide Diaz a complete record of the trial proceedings, in violation of Griffin v. Illinois, 351 U.S. 12, 15-16, 76 S. Ct. 585, 589-90 (1956). This argument fails. Diaz did not prove that any prejudice resulted from the failure to have certain portions of the trial proceedings transcribed. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.

Diaz argues that his appellate counsel was ineffective for failure to assert that the trial court interfered impermissibly with the attorney-client relationship between Lamons and Diaz by placing a court security officer in the room with Diaz and Lamons while they discussed a plea offer. Diaz's argument fails because the record shows that Diaz's counsel agreed to allow the security officer in the room where the meeting took place if the security officer stayed across the room and did

17

not listen to the conversation. Diaz's counsel, therefore, was not ineffective for failing to raise this issue on direct appeal.

### C. Diaz's Other Claims for Habeas Relief

Diaz contends that shackling him during trial, employing extra security guards in the courtroom (both uniformed and plainclothes), and ordering that all potential jurors be searched as they entered the courtroom prevented him from receiving a fair trial. Diaz asserts that he is entitled to relief under Holbrook v. Flynn, where the Supreme Court held that four uniformed security officers sitting on the first row of spectators' seats behind five criminal defendants did not deprive those defendants of a fair trial. 475 U.S. 560, 571, 106 S. Ct. 1340, 1347 (1986). Diaz also relies on a decision of this circuit that the use of a "stun belt" as a method of courtroom security violated the defendant's rights to a fair trial and to participate in his defense when the trial court did not make any factual findings to determine whether the stun belt was necessary. United States v. Durham, 287 F.3d 1297, 1309 (11th Cir. 2002).

Diaz's reliance on Durham is misplaced. Florida courts are not required to apply Durham because "[c]learly established federal law is not the case law of the lower federal courts, including this Court. Instead, in the habeas context, clearly established federal law 'refers to the holdings, as opposed to the dicta, of [the

18

Supreme Court's] decisions as of the time of the relevant state court decision.'" Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001) (citing Williams v. Taylor, 529 U.S. at 412, 120 S. Ct. at 1523).

Diaz's reliance on Holbrook is also misplaced. Diaz's violent history of successful escapes and continued plotting of escape attempts warranted the security measures that the trial court imposed. Diaz had a long history of violence and criminal escapes while incarcerated. Setting aside the murder for which he was on trial, Diaz had committed "an armed robbery, two escapes, the assault and battering of correctional officers, and a conviction for murdering the director of a drug rehabilitation center by stabbing him nineteen times while he slept." Diaz II, 513 So. 2d at 1049-50 (Barkett, J., specially concurring). That violent history was not lost on the trial court when it determined to employ extra security measures at Diaz's trial.

The Florida courts did not unreasonably apply, or decide contrary to, clearly established federal law when they held that shackles were necessary because Diaz presented a grave security risk and had a history of violent escape attempts. Just before his trial, Diaz was involved in a plot to smuggle a machine gun into the courthouse via a court security guard. Shackling Diaz furthered an "essential state policy" of lessening the very real threat that Diaz would make a violent escape

19

attempt.  Estelle v. Williams, 425 U.S. 501, 505, 96 S. Ct. 1691, 1693 (1976).

The Florida courts did not unreasonably apply, or decide contrary to, clearly established federal law when they held that the extra courtroom security personnel did not deprive Diaz of his right to a fair trial.  The Florida Supreme Court held that the number of uniformed officers at Diaz's trial was not unreasonably high, which complies with Flynn.  475 U.S. at 568-69, 106 S. Ct. at 1345-46.  The use of plainclothes officers, preferred by the Flynn Court, similarly did not prejudice Diaz.  Id. at 572, 106 S. Ct. at 1347.

The Florida Supreme Court reasonably determined that the trial court properly considered expert testimony regarding security measures, provided an adequate hearing regarding the implementation of those security measures, and was not required to provide a curative jury instruction regarding Diaz's shackles or poll the jury based on any potential prejudice that they might feel because of his shackles.  Trial judges have "sufficient discretion" to consider expert testimony regarding what security measures are necessary in a given trial.  Illinois v. Allen, 397 U.S. 337, 343, 90 S. Ct. 1057, 1061 (1970).

Diaz argues that the State withheld material exculpatory evidence and presented false testimony, and Diaz contends that his defense counsel failed to investigate the withholding of exculpatory evidence.  These arguments are

20

unexhausted, and "if [a] petitioner simply never raised a claim in state court, and it is obvious that the unexhausted claim would now be procedurally barred due to a state-law procedural default, the federal court may foreclose the petitioner's filing in state court." Bailey v. Nagle, 172 F.3d 1299, 1303 (11th Cir. 1999). Each of these arguments, therefore, fails.

Diaz contends that the Florida Supreme Court erred when it decided that the trial court improperly assessed an aggravating factor to Diaz when the trial court determined Diaz endangered many people, but did not reverse Diaz's death sentence because the trial court committed harmless error in that finding. This argument fails because the Florida Supreme Court conducted a reasonable analysis of harmless error. See Diaz I, 513 So. 2d at 1049.

Diaz's argument that Lamons did not provide effective assistance of counsel during the penalty phase of his trial, because he did not conduct a sufficient investigation into Diaz's background, also fails. Diaz argues that Lamons was ineffective because Lamons allegedly did not investigate or argue that Diaz had mental health problems, did not investigate Diaz's abusive family background, and did not sufficiently argue that the effects of his mental health, when combined with his family background, constituted mitigating evidence against imposing the death penalty on Diaz. The record shows that Lamons investigated Diaz's background

21

and tried to contact his family members; Lamons made a conscious decision not to bring Diaz's family to testify for fear that his relationship with Diaz would deteriorate and adversely impact Diaz's sentence because Diaz demanded that Lamons not contact his family; Lamons adequately investigated Diaz's mental health and declined to present some of the evidence that he found; and the district court was correct in its analysis that even if Lamons's performance was deficient, there was no resulting prejudice to Diaz.

## IV. CONCLUSION

Each of the arguments Diaz raised in his habeas petition is meritless. The denial of Diaz's petition is, therefore,

**AFFIRMED.**